UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| -against- | 7:19-CR-00548-KMK |
| **GABRIEL J. LETIZIA, JR.** | |
| Defendant. | |

## DEFENDANT GABRIEL J. LETIZIA'S

## SENTENCING MEMORANDUM

Date: May 2022

New York, NY

OFFICES OF FREDERICK P. HAFETZ

Frederick P. Hafetz

420 Lexington Avenue #2818

New York, NY 10170

George Weinbaum

12860 East Desert Trail

Scottsdale, AZ 85259

Attorneys for Defendant Gabriel J. Letizia, Jr.

1

## PRELIMINARY STATEMENT

We respectfully submit this sentencing memorandum on behalf of Gabriel Letizia, Jr., who is scheduled to be sentenced on May 18, 2022. Mr. Letizia, who is 72 years old and has an unblemished record, pleaded guilty to a conspiracy to defraud customers of AMA Laboratories, Inc., a company owned by him, and to two misdemeanors of misbranding the label of a sunscreen introduced into interstate commerce. In this memorandum, we request that Mr. Letizia be sentenced to home confinement.

We note first in the memorandum that while Mr. Letizia engaged in the financial fraud charged against him, there were no adverse health consequences as a result of his conduct nor at any time did Mr. Letizia believe there were possible adverse health consequences with respect to his conduct.

Mr. Letizia's request for a sentence of no more than one year in prison is, as set forth in the letter to the Court, founded on his extraordinary life of good deeds and devotion to the well-being of others – family, friends, employees, and strangers as well. These are valued character attributes that cannot be said of many persons – he truly has saved lives.

And, significantly, Letizia has sustained huge financial and reputational damage since the filing of the charges against him.

## THE SECTION 3553(a) FACTORS STRONGLY SUPPORT A SENTENCE OF NO MORE THAN ON YEAR IN PRISON

The sentencing maximum under the charges to which Mr. Letizia pleaded guilty are seven years – five years for the conspiracy charge and one year each for the two misdemeanor charges. Although that seven year maximum is substantially less than the guideline range for the

fraud charge here, we observe that, as courts of this District and many throughout the nation have observed, the financial fraud guidelines are absurdly high. See e.g. *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008); *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y 2006) (observing the "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic"). And, of course, the Supreme Court held in *Booker v. United Staes*, 534 U.S. 2005 (2005), the guidelines are "advisory" only. *Id.* at 245.

We address here the application of 18 U.S.C. 3553(a) to this case in order to determine a sentence that is "sufficient but not greater than necessary." *Id*.

### A. Nature of the Offense

Without in any way attempting to diminish the seriousness of the offence here – for which Mr. Letizia has accepted full responsibility – we observe, specifically, that this is not a case involving health risk and should not be regarded as so because there are FDA charges here. The AMA product in issue here is sunscreen. The only "adverse reactions" reported from testing done at AMA Laboratories were mild ones consisting of a redness on the skin of some persons who were tested. This redness lasted up to 24 hours. Mr. Letizia has no knowledge of medical interventions, let alone hospitalizations, being required in these situations.

### B. History and Characteristics of the Defendant

As stated by Judge Rakoff in *United States v. Adelson*, 441 F. Supp. 2d at 513-14:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and system of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

3

We discuss here, based on the letters to the Court, Mr. Letizia's "history and characteristics."

**1. Growing Up**

The story of Mr. Letizia's youth is a remarkable one – remarkable both for his Dickensian childhood of abuse and the harrowing characteristics of his mother's mental instability but also, resonating strongly here, the strength of character that Mr. Letizia exhibited during the family crisis from his mother's mental instability that might have broken apart many families. At the age of 12 after years of abuse from his mother who when Gabe was 8 told him to leave the house and go live in the Wartburg Home orphanage and who would lock him in a closet on many occasions, saved his mother's life by administering CPR to her after she attempted to commit suicide by overdosing from barbiturates. Then, several years later, after his parents divorced and his mother left Gabe, his three younger siblings and father in the house, Gabe was instrumental in keeping the siblings from being sent to an orphanage by helping to take care of them.

Gabe has three younger siblings: Geri, two years younger than Gabe, Gary, four years younger than Gabe, and Gail, 6 years younger than Gabe. Their letters to the Court describe Gabe's horrendous childhood experiences and how he responded to them.

Gary, an antique furniture restorer who contracts with major antique furniture insurers, writes:

> I am one of four siblings of which Gabe is the oldest. Our mother suffered from alcohol abuse which led to the broken home that we came from. When I stated

4

> that Gabe was the glue that held our family together, I'm not stating that lightly. During our younger years there was always turmoil in our home due to our mother's alcohol addiction. She had an explosive personality and Gabe caught the brunt of it on many occasions. One time after Gabe had misbehaved our mother made him pack a suitcase and told him to leave the house and go live in the children's orphanage. Gabe couldn't have been more than eight years old. My memory of that day still resonates deeply with me, to see your older brother in tears pleading with his unstable mother to please don't make me go to the home can still bring me to tears.

(Ex. 1).

Geri, now retired from a long teaching career, similarly describes the abuse that all four siblings, but particularly Gabe, suffered from their unstable mother:

> We were on the front lines of a mother who suffered from alcoholism and mental illness. She had a wicked temper which was often directed at us. Gabe suffered beatings on a regular basis. Sometimes, Mom would put him in a closet and lock the door. I did my best just to stay clear.

(Ex. 2).

Gary, in his letter, powerfully describes the day that their mother attempted suicide and how Gabe, then 12, saved her life.

> I think that the year was 1965 or 1966 our mother tried to commit suicide by overdosing on barbiturates. It was Gabe and our older sister Geri that found her unresponsive on the floor of her bedroom. It was Gabe's quick thinking and swift actions that saved her life. The very same child that a few years earlier she was going to send to an orphanage. Gabe was probably 12 years old at the time.

As sister Geri writes of the suicide attempt and Gabe saving their mother's life states, the children "witnessed things no child should have seen at our tender ages."

Geri further states:

> Gabe saved our mother's life that night. It is this kind of courage and intelligence that helped us all to survive the traumatic times that we four children faced. Sadly, it wasn't the only suicide attempt, but Gabe had established himself as the one steady and level-headed enough to pull us through.

5

After the trauma of their mother attempting to commit suicide and two years later leaving home in a marital breakup, the Letizia children, the older of whom was Gabe at 14, confronted the very real possibility that the Child Protection Agency would break up the family and send them to separate homes. Their father was very devoted to the children but worked six days per week from early morning until 6 or 7 in the evening. Gabe, though young, understood the danger of the family being broken apart and the need for him to take on the responsibility of keeping the family together.

Long time family friend since childhood Joanne Dipinto, who worked as a corporate administrative assistant and at one time legal assistant to CBS president Palmer Williams, writes about "Gabe taking on the parental role." (Ex. 3). Brother Gary describes how Gabe kept the family together:

> Again in 1966 there was a very real chance the social workers from the Child Protection Agency would try and split us up and place us in a more stable environment. Gabe was instrumental in keep [sic] us together as a family. We all had to take on new responsibilities and we all had to pitch in and help out with the chores of running a household. But it was Gabe that was instrumental in keeping it together. He basically prevented any harm to our family by making sure the house was clean, laundry was done and there was food on the table. I will forever be grateful for his unselfish kindness that helped us get through a very turbulent time. I should note here that our father was also a large force in our lives, but working ten hours a day left him little time, but his financial support and love was always there.

Echoing Gary, younger sister Gail writes:

> Upon mom's departure, Gabe sat his siblings down and explained how important it was that we all stay together as a family and the importance of the family unit. My fear was removal from our home and breaking our sibling bond. Gabe reassured all of us that he would never let that happen, no matter what. From that point on, Gabe assumed a parental role far beyond his young teenage years. He saw to it that homework was done and a meal was on the dinner table.

6

> He helped with homework and the everyday problems that occurred in our household.

(Ex. 4).

**2. Good Deeds Throughout His Life**

The same strong character that Gabe demonstrated in his early years has remained throughout his life. It is exhibited in his good deeds and innate concern about others throughout his life as the letters to the Court attest.

Jerry Koshel, a 30-year friend and former neighbor of Gabe, in his heartfelt letter to the Court states emphatically that Gabe saved his life. A long time special education teacher, now retired and working with autistic teens and young adults, Mr. Koshel describes a series of debilitating illnesses and physical problems inducing severe sleep apnea and other maladies that severely afflicted his physical and mental well-being. He writes:

> During the years of such extreme mental and physical challenge and weakness, my suffering was so great that I believe if it were not for the care and help from Gabe Letizia I would have died in some way from all of the stress…if it were not for Gabe to care, to give me help and hope when I needed it, to pray with me, I would have given up.

(Ex. 5).

This extraordinary devotion and concern for others is manifested in the poignant letters from the children of the women with whom he had long-term relationships after his divorce in 1989. These letters are striking in their depiction of their genuine appreciation for Gabe's devotion to them even many years after his relationship with their mother ended.

Neema and Naveed Moghadam are children of the woman with whom Gabe lived following his divorce. Neema who was only 5 when his mother first met Gabe states that even in his teen years after Gabe's relationship with his mother had ended:

> He knew that I needed him most through that time and our relationship did not miss a beat. That stability through unstable times allowed me to stay balanced and keep developing as a productive member of society. He kept a strong bond and consistent bond with me, my brother and cousin.

(Ex. 6).

Similarly, Neema's brother Naveed describes his close relationship with Gabe in the many years since Gabe's relationship with his mother ended. (Ex. 7).

Particularly demonstrating Gabe's generous nature is his relationship with Naveed and Neema's cousin Kyle. Now a college student, Kyle whose mother died of cancer when he was 6 years old, depicts his life alone in New York after his father had to leave for Iran early in Kyle's high school years. His only family were cousins Naveed and Neema and their mother Pari, notwithstanding that Gabe and Pari had ended their relationship years earlier and that "Gabe never had to do any of this." Gabe out of compassion for this essentially fatherless boy developed a relationship with Kyle and made a consistent effort to stay close "with Kyle as well as his cousins." He writes "I am forever grateful that I have a person with such care in my life…[H]e is the man who will always be the mentor in my life." (Ex. 8).

And, Shali Sterry, the daughter of the woman with whom Gabe lived for ten years after his divorce, many years after this relationship ended, writes affectionately:

> So many warm and loving characteristics made Gabe a beacon for me. The eternal optimist and problem solver, he is known to be the one to care for help and advice. Whatever he has he will share with those in need. However he can help, he will offer it with no thought for his personal needs.

(Ex. 9).

Her husband Dr. Thomas Sterry, who has gotten to know Gabe as "a wonderful stepfather to my wife and a fantastic grandfather to my children," recounts an incident that captures well Gabe's ingrained nature of helping others including those he does not know. Describing Gabe meeting for the first time a cousin of Dr. Sterry, writes:

> who was pregnant out of wedlock who was scared, confused and isolated. She was petrified to discuss this with her mother or father but found that she could discuss it with Gabe. He called my wife and I to give her emotional and financial support.

(Ex. 10).

Dr. Sterry, in a humorous vignette, also captures, as he puts it, the "warm and colorful side" of Gabe. He writes about

> the time he got a homeless man who was begging him to sing a song. The two of them eventually started singing Mr. Bojangles together and literally dancing in the street. It was the kind of a marvel I wish that you could see.

**3. Good Deeds**

Many of the letter-writers depict the extraordinary good deeds by Gabe throughout his life. Christina Adrianopoulos met Gabe many years ago through her friend Ruth Bordas-Hercolani. Mrs. Bordas-Hercolani became Gabe's fiancée but unfortunately passed away two years ago before she and Gabe were able to wed. Ms. Adrianopoulos is a very accomplished person who works in strategic marketing as a consultant for global corporations. She has served in a number of public positions in Massachusetts where she resides and on the boards of many not-for-profit entities.

In 2013 during her international business travel to Liberia she was a kidnapping victim and held hostage for a $5 million ransom, tied up and beaten daily. She was terrified and feared

9

that [she] would never see [her] children or family again. Although law enforcement agents were involved, her family also contacted Gabe who, she writes, "did not hesitate to step in" and "reached out to a person whom he knew." She was released shortly after Gabe got involved. She states: "Gabe was instrumental in helping me stay safe and return to the United States." (Ex. 11).

Brother Gary recounts multiple examples of Gabe's compassion and kindness to others. He writes about a cousin and her husband who lost their jobs and were in danger of losing their house and Gabe came to their rescue:

> First [he] offered my cousin a position and then a short time later offered her husband a position as well. They ended up not losing their home and continued working for him a number of years.

Gary movingly describes how when his and Gabe's mother – the same mother at whose hands Gabe had suffered such abuse as a child, had a need for money when she retired, "it was Gabe who offered her a job and helped her."

Gabe's sister Gail writes that when she and her husband sold their home in 1998 and had no place to live until they found a new home, Gabe "insisted" that they move in with him until they found a new home. They lived with him for 8 months while Gabe "spent endless hours" trying to help find a house for her and then helping her move in.

Gail's husband Michael LaRotunda, a seventeen-year criminal investigator in the Westchester County District Attorney's Office, writes that Gabe "always takes care of friends and family" and that "he will literally give you the shirt off his back." (Ex. 12).

Friend Jerry Koshel in his letter relates that Gabe without "want[ing] it to be known" paid for underprivileged children born with harelips to have them surgically removed.

Friend Jill Hollander describes how in 2013 she began cancer treatment and was faced with "overwhelming" medical issues and personal expenses. Gabe began helping her with her financial expenses and continues to do so. (Ex. 13).

Childhood and long-term family friend Joanne DePinto in her letter summarizing the essence of Gabe's kindness and generosity writes that he "has a heart of gold" and "would give you the shirt off his back."

### III. Deterrence Factors

Gabe Letizia is 72 years old. He has lost the business that he worked hard to build over three decades. He has lost nearly all the assets he had in an effort to keep his business afloat in the four years since the investigation began. As his net worth statement shows, his assets now consist of $100,000. Additionally, the criminal case against him and his guilty plea received extensive press coverage in the mid-Hudson area. As Mr. Letizia states in his letter to the Court expressing remorse for his criminal conduct, he has been publicly shamed and humiliated. (Ex. 14). He is a broken man who has been shorn of virtually all of his assets and poses no threat of committing future crime.

### CONCLUSION

For all of the foregoing reasons we respectfully request that the Court impose a sentence of home confinement.

Respectfully submitted

By  /s/ Frederick P. Hafetz
_____

OFFICES OF FREDERICK P. HAFETZ

Frederick P. Hafetz

420 Lexington Avenue #2818

New York, NY 10170


By  /s/ George Weinbaum
_____

George Weinbaum

12860 East Desert Trail

Scottsdale, AZ 85259