**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**                     :

   **- v. -**                                        :

                                    **19 Cr. 548 (KMK)**

**GABRIEL LETIZIA, Jr.,**                         :

           **Defendant.**                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SENTENCING MEMORANDUM**
**REGARDING DEFENDANT GABRIEL LETIZIA, Jr.**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

JEFFREY C. COFFMAN
JAMES McMAHON
OLGA I. ZVEROVICH
Assistant United States Attorneys
- Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA          :

   - v. -                                    :

GABRIEL LETIZIA, Jr.,                     :                      19 Cr. 548 (KMK)

       Defendant.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT GABRIEL LETIZIA, Jr.

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Gabriel Letizia, Jr. ("Letizia" or the "defendant"), which is scheduled for May 18, 2022, at 11:30 a.m.   For the reasons stated below, the Government respectfully submits that the defendant's serious criminal conduct warrants the stipulated Guidelines sentence of 84 months' imprisonment (the "Stipulated Guidelines Sentence"). Letizia's requested sentence of no more than one year of imprisonment and home confinement would fail to serve the essential sentencing goals of providing just punishment, affording general deterrence, and promoting respect for the law.

Letizia led a conspiracy, for three decades, to defraud consumer products companies that paid Letizia's company, AMA Laboratories, Inc. ("AMA"), to conduct laboratory testing and prepare reports concerning the safety and efficacy of products including sunscreens, antiperspirants, and cosmetics.   From 2012 through April 2017, approximately 70% of the reports prepared by AMA were fraudulent, principally because AMA failed to test the requisite numbers of panelists.   Instead, AMA made up laboratory testing data.   AMA's clients, including some of the largest cosmetics companies in the world, relied on AMA's laboratory reports to support their

1

claims their products were safe, effective, hypoallergenic, or provided a specified Sun Protection

Factor ("SPF").   Letizia and AMA's deliberate falsification of safety and efficacy data for

consumer products, including sunscreens, used by millions of people, including children and

babies, created a significant risk of harm.

AMA and Letizia, its sole owner, received approximately $46,200,000 from the preparation

of the fraudulent reports from 2012 through 2017.

I.   **Factual Background**

**A.  Letizia's Offense Conduct**

As set forth in the Presentence Investigation Report ("PSR"), Letizia was the owner and

executive director of AMA, a consumer product testing company in Rockland County, New York.

(PSR ¶ 11).   Letizia began operating AMA in the early 1980's, and became its sole owner in

approximately 2003.   (*Id.*).   Letizia falsely used the title "Dr.," in correspondence, and otherwise

represented to AMA's clients that he held a Ph.D.; in truth, however, he has never held a Ph.D.

(PSR ¶ 12).

AMA purported to test the safety and efficacy of cosmetics, sunscreens, and other products

on specified numbers of volunteer panelists for consumer products companies.   (PSR ¶ 11).

Clients of AMA used the test results to support their claims that their products were safe, effective,

hypoallergenic, or provided a certain SPF, including after exposure to water.   (*Id.*).   AMA clients

that manufactured sunscreens used the test results to comply with FDA regulations requiring

sunscreen manufacturers to have their products tested and to maintain the test results for possible

review by the FDA.   (*Id.*).

From 1987 through April 2017, Letizia and AMA personnel operating at his direction

defrauded AMA's customers of more than $46 million by testing products on materially lower

numbers of panelists than the numbers specified and paid for by AMA's customers.   (PSR ¶ 12).

According to AMA employees from all three departments, the majority of AMA's tests contained

fraudulent results, for two reasons.   (PSR ¶ 13).   First, at Letizia's instruction, AMA personnel

rarely tested products on the number of panelists requested by AMA's clients.   (PSR ¶ 14).

Instead, AMA tested products on a far lower number of panelists, typically 20 or less, rather than

the 50 for which the clients had paid.   (*Id.*).   AMA's fees for tests were based, in part, on the

number of panelists that were to participate in the study.   (*Id.*).   However, at Letizia's direction,

AMA sent its clients fraudulent test results in which AMA personnel included fictitious data for

"phantom" panelists who had not actually participated in the tests.   (*Id.*).   Per Letizia's order,

AMA employees had panelists who agreed to partake in studies at AMA fill out consent forms and

other paperwork as if they would be participating in all of the studies that were being performed at

AMA that time.   (*Id.*).   This was done even for panelists who only participated in a single study,

so that their information could be fraudulently used for other AMA studies in which the panelists

were not actually going to participate.   (*Id.*).   These panelists were then used as "phantom"

panelists in other studies, and their consent forms for those studies would falsely make it appear,

including to FDA inspectors and AMA's customers who might audit AMA's files, that the

panelists had participated in studies when, in fact, they had not.   (*Id.*).

Second, at Letizia's direction, AMA personnel routinely falsified test results relating to its

clients' products, which included suppressing adverse reactions and deviating from testing

protocols.   (PSR ¶ 15).   AMA personnel reported adverse reactions to clients only in extreme

cases and often offered to retest the product and, in some cases, change the test procedure with the

hope of reducing the number of reported negative reactions.   (*Id.*).   They also falsified data to

accord with prior results from smaller "screener" study results or client expectations.   (*Id.*).

3

Public reporting reflects complaints from many consumers concerning the safety and efficacy of AMA-tested products, including sunscreens and lip balm.   *See, e.g.,* Lisa Parker and Robin Green, *Burn Notice: Angry Parents, Sunburned Kids and Complaints About a Popular Brand of Sunscreen*, NBC Chicago (July 23, 2015), available at *https://www.nbcchicago.com/news/local/angry-parents-complaints-about-popular-sunscreen-brand/1983839/*; Greg Seals, *EOS Lip Balm Lawsuit Updated: The Brand Is Compensating Customers Who Experienced Blisters and Rashes*, Glamour (November 2, 2016), available at https://www.glamour.com/story/eos-lip-balm-lawsuit-blisters-compensation, both attached as Exhibit 1.   Notably, in response to the consumer complaints concerning the sunscreens referenced in the foregoing NBC Chicago article (and others), the manufacturer issued a statement informing consumers:

> Our Sunscreen Lotion was tested, by an independent 3rd party, against the protocols prescribed by the U.S. Food & Drug Administration's (FDA) monograph for over-the-counter sunscreen products.   The results showed that our product is effective and safe for use as an 80-minute water-resistant (FDA's highest rating).

Jessica Fecteau, *Jessica Alba's Honest Company Responds to Sunscreen Complaints: 'We Take All Consumer Feedback Very Seriously': The company stands behind its sunscreen's efficacy*, People (updated August 2, 2015), available at https://people.com/celebrity/jessica-albas-honest-company-responds-to-sunscreen-complaints/.   The referenced "independent 3rd party" was AMA.   As the supervising laboratory technician in AMA's SPF department has reported, in addition to a lack of sufficient panelists and technicians, which affected SPF testing in general, the SPF department did not have enough bathtubs to conduct testing in compliance with FDA time requirements for water-resistance-testing of sunscreens.

The true extent of the harm caused by Letizia's fraud may never be fully known. Concerns about ineffective sunscreen products are particularly acute in countries with higher levels

4

of UV radiation, which can increase the risk of developing skin cancers, sometimes years after

exposure.   In New Zealand, a non-profit consumer protection organization, Consumer NZ,

reported that nine of 20 sunscreen products it tested, including several that were tested by AMA,

did not provide the sun protection they claimed:

> Consumer NZ chief executive Sue Chetwin said sunscreens that failed included a Cancer Society product and several other big-name brands.
>
> Ms Chetwin said the Cancer Society Everyday Sun Lotion SPF50+ was tested at two different labs and returned a maximum of SPF30. To claim SPF50+, a sunscreen has to achieve SPF60 in lab tests.
>
> "As a result of our findings, the Cancer Society said it's withdrawing the batch of the product we tested. However, given the reports we have from two separate labs showing the sunscreen doesn't measure up to its claimed performance, we've asked it to recall all batches of this product," Ms Chetwin said.
>
> Sunsense Ultra SPF50+, Banana Boat Dry Balance Sunscreen Lotion SPF50+ and Marine Blue Australia Dry Touch Sunscreen Lotion SPF50+ also failed to meet their SPF50+ claims. The products only provided moderate protection, returning SPFs from 20.61 to 26.4.
>
> Five other products also didn't provide the SPF claimed on the label, although still provided high protection (SPF 30 to 50), and three sunscreens didn't provide the broad-spectrum protection claimed.
>
> Ms Chetwin said several companies, including the Cancer Society and Sunsense, had tested their products at AMA Laboratories, a sunscreen-testing facility in the US. The Cancer Society's test report for its product was from 2019 and Sunsense's from 2016.

*Big Brands Fail Sunscreen Test*, Consumer NZ (November 21, 2019), available at

https://www.consumer.org.nz/articles/big-brands-fail-sunscreen-test, attached as Exhibit 2.

From 2012 through April 2017, AMA received $46.2 million in revenue from the

fraudulent reports.   Letizia received wages and shareholder distributions of approximately $8.5

million from AMA during that same period.   Some of his draws went toward luxury items,

including a $204,158 Mercedes S63 AMG he purchased outright with AMA corporate checks in

2014.   (PSR ¶ 17; Superseding Indictment ¶ 7, Dkt. 11).   Letizia had a nice home in Manhattan,

owned other luxury vehicles, and traveled to India at least 18 times.   (PSR ¶ 50).   Letizia also obtained substantial cash as part of the scheme – the excess panelist fees that were withdrawn from AMA's bank account to pay "phantom" panelists.   (PSR ¶ 17).   One of Letizia's children ("W-1"), who worked at AMA, reported that after AMA's facilities were searched by law enforcement in 2017, Letizia told W-1 there was a million dollars in cash hidden in cases behind car tires, and asked W-1 to go get it, but that W-1 did not do so.   The Government has been unable to locate this cash, or determine what became of it.   Simply put, although Letizia profited handsomely from his crimes, at the time of the PSR, the Government, despite substantial efforts, has been unable to track down sufficient assets with which Letizia could make full restitution to his victims or satisfy the $46,200,000 money judgment he agreed to in the consent preliminary order of forfeiture (Dkt. 56). (*Id.*).[1]

## B.  Procedural History

On July 30, 2019, an indictment was filed in this District charging Letizia with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud, in violation of 18 U.S.C. § 1343.   (Dkt. 2).   Letizia was arrested on August 9, 2019.   (PSR ¶ 18).   On October 29, 2019, a Superseding Indictment was filed charging Letizia with the same offenses, and an additional count of money laundering, in violation of 18 U.S.C. § 1957, relating to his purchase of the Mercedes with fraud proceeds.   (Dkt. 11).

On May 4, 2021, a three-count Superseding Information (the "Information") was filed charging Letizia with conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 371 and 1343,

---

[1]  As detailed below, however, AMA holds a $790,000 receivable, which Letizia has never disclosed, including in the sworn financial affidavit he submitted to the Probation Office pursuant to 18 U.S.C. § 3664(d)(3).

and two misdemeanor counts of willfully causing a misbranded drug to be introduced into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and 333(a)(1).   (PSR ¶¶ 1-4; Dkt. 52). The same day, Letizia appeared before United States Magistrate Judge Paul E. Davison and pleaded guilty to all three counts of the Information.   This Court accepted Letizia's plea on May 20, 2021.   (*See* Dkt. 58).

### C.  Loss, Restitution, and Forfeiture

Pursuant to his plea agreement, Letizia agreed that the loss amount is $46,200,000, and agreed to make restitution to his victims in an amount ordered by the Court in accordance with Title 18, United States Code, Section 3663A.   (Plea Agreement at 2; PSR ¶ 6(k)).   As reflected in materials previously forwarded to the Court and Letizia, the Government has received information from several of the victims regarding those victims' losses totaling $1,440,238.   The Government will submit a proposed restitution order for the Court's consideration in advance of sentencing.

Also pursuant to Letizia's plea agreement, at the time of his plea the Court entered the Consent Preliminary Order of Forfeiture, which imposes a money judgment in the amount of $46,200,000, representing the amount of proceeds traceable to the offenses charged in Counts One through Three of the Information that Letizia personally obtained.   (Dkt. 56; Plea Agreement at 2; PSR ¶ 6(k)).

### D.  Letizia's Concealment From the Probation Department of a $790,000 Receivable Held by AMA

On or about November 18, 2020, Letizia sold, for $840,000, some of the assets of AMA to an individual who now operates another consumer products testing company at AMA's prior campus in New City, New York.   In exchange, the buyer's previous loan of $50,000 to AMA was converted to a down payment, and the buyer agreed to pay an additional $790,000 "over the course of thirty (30) years with interest at two-and-one-half percent (2.5%) per annum."   *See* "Contract of

Sale of Assets," attached as Exhibit 3.   We understand that no payments have been made yet toward the $790,000 principal balance.

In accordance with 18 U.S.C. § 3664(d)(3), Letizia submitted to the Probation Office an affidavit, sworn under penalty of perjury, in which he purported to set forth a complete listing of all assets he owned or controlled and any assets he had transferred or sold since the date of his arrest.   (PSR ¶ 61).   In his sworn affidavit, Letizia disclosed assets totaling $371,000.   (*Id.*).   Letizia did not disclose this $790,000 asset held by AMA.   (PSR ¶ 61).   He told the Probation Officer that AMA "has no value."   (PSR ¶ 60).

### E.  Sentencing Guidelines Range and the Recommendation of the Probation Office

In the plea agreement, the parties stipulated that the applicable Guidelines sentence is 84 months' imprisonment, based on a total offense level of 33, a Criminal History Category of I, and the 84-month total statutory maximum sentence for Counts One through Three.   (Plea Agreement at 1-3).   The PSR contains the same Guidelines calculation as that set forth in the plea agreement. (PSR ¶¶ 23-39, 66-68).   The offense level of 33 is calculated as follows:

- A base offense level of 6, (PSR ¶ 25);

- A 22-level increase, based on a loss of more than $25,000,000 and less than $65,000,000, (PSR ¶ 26);

- A 2-level increase because the offense involved ten or more victims, (PSR ¶ 27);

- A 2-level increase because the offense involved sophisticated means, (PSR ¶ 28);

- A 4-level increase because Letizia was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, (PSR ¶ 30); and

- A 3-level reduction for acceptance of responsibility (PSR ¶ 34-35).

The Probation Office recommends a sentence of 84 months' imprisonment – 60 months on Count One and 12 months on both Count Two and Count Three, all to run consecutively, explaining as follows:

> Given the information available to the Probation Office through a conversation with defense counsel and as reflected in the offense conduct, it appears that these crimes were financially motivated. We remark that although Letizia profited handsomely from the scheme, which includes sharing his fortune with others, the Government has been unable to track down significant remaining assets to satisfy the agreed-upon forfeiture.
>
> . . .
>
> The Probation Office recognizes that Letizia endured a difficult childhood, is in poor physical health and lost his business. We also acknowledge that this is the defendant's first documented serious offense, he does not appear to be a danger to the community, and his risk of recidivism is low given his age and lack of a significant criminal history. However, we cannot disregard the length of the sophisticated conspiracy which he led; the number of victims; and the staggering loss amount, which will likely not be repaid/recovered. Accordingly, we believe that to address the sentencing objectives of just punishment and general deterrence, a custodial term is warranted. Thus, we recommend the statutory authorized maximum sentence for all counts, 84 months' imprisonment.

(PSR at 18).   For the reasons discussed in detail below, the Government respectfully submits that Letizia's decades-long leadership of a conspiracy that generated over $46 million in losses and that caused products to be marketed to millions of consumers based upon fraudulent laboratory testing that resulted in a serious risk of harm to those consumers warrants the Court's imposition of the Stipulated Guidelines Sentence of 84 months' imprisonment, as recommended by the Probation Office, and that the factors cited by Letizia do not support a downward variance in this case.

## II.    <u>Sentencing Legal Principles</u>

The Guidelines are no longer mandatory, but they continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar

ways." *United States v. Booker*, 543 U.S. 220, 252 (2005); *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

III.   **Section 3553(a) Analysis**

The Government respectfully submits that a sentence of 84 months' imprisonment is necessary to reflect the seriousness and aggravated nature of Letizia's offense conduct, provide just punishment, afford deterrence, and promote respect for the law.

**A.  Nature and Circumstances of the Offense**

The nature of this offense is greed.   For thirty years Letizia perpetrated his fraudulent scheme, and employed coconspirators to assist him in doing so.   He operated a fairly large laboratory in order to perpetrate his fraud, and made a conscious and deliberate choice every business day not only to defraud AMA's customers of tens of millions of dollars, but also to expose the public to consumer products marketed on the basis of falsified laboratory test reports regarding their safety and efficacy.   Letizia's crimes were not aberrant or the result of a momentary lapse of judgment.   Instead, Letizia did this on a daily basis, and had numerous of his employees commit fraud on a daily basis, for decades, without regard to the risk to the public, in order to enrich himself.   This prolonged and serious criminal conduct warrants a term of incarceration of the Stipulated Guidelines Sentence.

In an effort to minimize the seriousness of his crimes – while claiming he is not doing so – Letizia argues:

> [T]his is not a case involving health risk and should not be regarded as so because there are FDA charges here.  The AMA product in issue here is sunscreen.  The only "adverse reactions" reported from testing done at AMA Laboratories were mild ones consisting of a redness on the skin of some persons who were tested.

(Def. Mem. at 3).   The Government does not dispute that the only adverse reactions reported from RIPT testing done at AMA Laboratories were mild ones consisting of a redness on the skin of some persons who were tested.   But Letizia's argument entirely ignores two significant risks resulting from his fraud.   First, the inadequate numbers of panelists on whom RIPT testing was

11

performed means that the statistical significance of the tests was substantially less than what the manufacturers of the products paid for and relied upon in marketing and distributing their products to the public.   The adverse reactions experienced by the few panelists on whom products were tested by AMA are simply not the point – the danger here is the risk to the larger consuming public whose safety was compromised by the fraudulent tests.   Second, Letizia's argument focuses only on adverse reactions.   In the case of sunscreen, efficacy becomes the larger issue in assessing the health risk to the public resulting from Letizia's crimes.   As set forth above, the skin cancer resulting from the false SPF and water-resistance markings on sunscreen products tested by AMA and sold throughout the United States and the world is unknowable.   Although Letizia seeks to minimize his offense by referring merely to "redness on the skin" of test subjects, his decades-long scheme to produce fraudulent laboratory test reports that falsely reflected that laboratory testing was done in compliance with FDA guidelines created a substantial risk of harm.

**B.  History and Characteristics of the Defendant**

Letizia is 72 years old.   He grew up in the Bronx and Mount Vernon, New York.   (PSR ¶¶ 44, 46).   The PSR does not suggest that his family struggled financially; however, Letizia reported that he had a "harrowing" childhood, during which he regularly received corporal punishment.   (PSR ¶ 46).   Letizia, and his siblings through their letters accompanying Letizia's sentencing submission, have reported that Letizia helped to keep the family together after Letizia's mother left the home when he was approximately 12 or 13 years old.   (*See* PSR ¶ 47; Def. Mem., Ex. 3 and 4).   Letizia had two children from a marriage that ended in 1989.   (PSR ¶ 48).   Letizia was then estranged from his children for several years, until they were approximately college-age. (*Id.*).   Letizia later hired both of his children to work at AMA, where he claims they "made a great

deal of trouble." (*Id.*).   He fired them after the 2017 search of AMA, and has not had any contact with them since.   (*Id.*).

As compared to many defendants who appear before this Court, Letizia has enjoyed great financial success as the operator of AMA.   He possessed the intelligence and other natural abilities and skills to run a laboratory that generated tens of millions of dollars in revenue and employed dozens of people.   Letizia knew full well that he was operating a fraudulent business, but chose to do it anyway – year after year and decade after decade.   His conduct clearly demonstrates that he was motivated by greed and a desire to maintain his lavish lifestyle, even if it meant breaking the law and exposing unwitting consumers to risk.

Not surprisingly, the defendant has been able to muster a substantial number of letters from his friends and family members and from those whom he has helped in the past.   While many of the letters describe positive things the defendant has done, and the Court should consider them, the Government submits that they should not be as significant in determining the defendant's sentence as the defendant suggests.   The Government does not question that Letizia demonstrated admirable qualities in assisting his younger siblings when his mother left the family's home – but this was more than 60 years ago and does not, in any way, detract from the sophisticated fraud scheme that Letizia perpetrated at AMA.   Nor does the Government dispute that, during the course of his 30-year fraud scheme, Letizia used some of his substantial wealth to help others. But, while admirable, this does not set Letizia apart from other similarly situated white-collar defendants—individuals who, although high-achieving and successful in their fields, nonetheless choose to steal and defraud, and to hide that side of themselves from family and friends, as Letizia did.   Courts recognize that it is the norm for professionally successful defendants to be involved in charitable works.   *See, e.g., United States v. Barbera*, 2005 WL 2709112 at * 12-13 (S.D.N.Y.

2005) (citing *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) (community involvement not out of the ordinary for high ranking businessmen; "[l]ikewise, excellent character references are not out of the ordinary [for white collar defendant]; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her")); *United States v. Kolbach*, 38 F.3d 832, 838 (6th Cir. 1994) ("it is *usual* and *ordinary*, in the prosecution of white-collar crimes involving high-ranking corporate executives . . . to find that a defendant was involved as a leader in community charities . . . and church efforts" (emphasis in original)); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) ("high-level business executives . . . enjoy sufficient income and community status so that they have the opportunities to engage in charitable and benevolent activities").

To the extent that Letizia suggests that his humiliation and loss of financial and reputational standing as a result of his conviction warrants a lighter sentence (*see* Def. Mem. at 2), this claim should be rejected.   Any notion that highly successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot be countenanced. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."   *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life.   '[N]one of these things are [his] sentence.   Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of

14

his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").   And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized.   Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity.   It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class.   But in this instance we must fight our nature.   Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life.   For 30 years, Letizia methodically led and perpetrated a fraudulent scheme designed to defraud AMA's customers while simultaneously exposing the public to products sold on the basis of fictitious laboratory test reports.   His scheme involved directing many of his employees' participation in the fraud, including four who have pleaded guilty to participating with Letizia in the conspiracy: AMA's former Technical Director, Clinical Laboratory Director, Associate Director of Clinical Studies, and SPF Department Supervising Laboratory Technician.   This prolonged, greed-driven criminal conduct warrants serious punishment.

And as he stands to be sentenced by this Court, Letizia has made no effort to pay restitution to his victims, appears to have spent or hidden almost all of the substantial assets he once held, and continues to attempt to conceal assets, including by omitting his largest known asset, a $790,000 account receivable from the sale of AMA, in the sworn financial affidavit he submitted to the Probation Department.

### C.  The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).   General deterrence is critical in cases like this given the substantial financial incentive that exists to generate money through fraud, particularly a fraud as lucrative as Letizia's.   It is also important because of the larger public health implications of laboratory testing fraud involving consumer products, including sunscreens.   Finally, as a result of the significant resources required to mount an investigation to uncover a sophisticated, long-running fraud such as this one, such investigations are relatively rare.   Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence.   The need for general deterrence is at its peak here, where Letizia's fraud was both lucrative and difficult for law enforcement to detect.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

In an effort to escape accountability for his crimes, Letizia requests a sentence of "home confinement" and "no more than one year in prison."   (Def. Mem. at 2).   The Government respectfully submits that such a sentence would not only fail to reflect the seriousness of Letizia's crimes, but also fail *entirely* to serve the goal of general deterrence.   The message that would be sent to others by such a sentence is that fraud involving the falsification of laboratory test reports

of consumer products is not a big deal and that a multi-decade, sophisticated, lucrative fraud scheme is, essentially, not worthy of punishment at all.   Such a sentence would incentivize other would-be fraudsters—the reward is high, the chance of being caught and successfully prosecuted is very low (it took 30 years in Letizia's case), and the punishment in the unlikely event of a successful prosecution is minimal.   Respectfully, that is *not* the message that this Court should send to the public through its sentence of Letizia.

As the Court knows, the Court can (and should) consider the full scope of Letizia's criminal conduct, including relevant conduct, as part of its Section 3553(a) analysis and impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.   The Government respectfully submits that, in this case, an analysis of the Section 3553(a) factors requires that the Court impose an 84-month sentence to appropriately reflect the serious, aggravated, and prolonged nature of Letizia's crimes, afford just punishment, and achieve general deterrence.

## IV.   <u>Conclusion</u>

On the facts of this case, a sentence of the Stipulated Guidelines Sentence of 84 months in prison is appropriate and just.   Such a sentence would reflect the seriousness of Letizia's crimes, afford just punishment, and send a message to others that a substantial jail term is the likely consequence of such criminal conduct.   By contrast, a sentence involving minimal or no prison time would be perceived by the public as a slap on the wrist and would fail to deter anyone from flouting the law and jeopardizing public health for profit.   Accordingly, the Government respectfully requests that the Court impose a sentence of 84 months' imprisonment, and order restitution in the amount of $1,440,238 and forfeiture in the amount of $46,200,000.

Dated:  White Plains, New York
        May 11, 2022

                              Respectfully submitted,


                              DAMIAN WILLIAMS
                              United States Attorney

                    By:       _____
                              Jeffrey C. Coffman
                              James McMahon
                              Olga I. Zverovich
                              Assistant United States Attorneys