```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------x
 3  UNITED STATES OF AMERICA,

 4
                                        7:19-CR-548 (KMK)
 5      -vs-
                                        SENTENCING
 6
    GABRIEL LETIZIA,
 7
                             Defendant.
 8  ------------------------------------x

 9                              United States Courthouse
                                White Plains, New York
10
                                Wednesday, May 18, 2022
11                              11:30 a.m.

12
    B e f o r e:
13
                                HONORABLE KENNETH M. KARAS,
14                              District Judge

15

16  A P P E A R A N C E S:

17
    DAMIAN WILLIAMS
18      United States Attorney for the
        Southern District of New York
19  JAMES F. McMAHON,
    OLGA I. ZVEROVICH,
20  JEFFREY COFFMAN,
        Assistant United States Attorneys
21

22  OFFICES OF FREDERICK P. HAFETZ
    FREDERICK HAFETZ, ESQ.
23      Attorney for Defendant

24  GEORGE WEINBAUM, ESQ.
        Attorney for Defendant
25
```

1           THE DEPUTY CLERK:  All rise.  The Honorable Kenneth M.

2   Karas presiding.  19-CR-548, the United States of America v.

3   Gabriel Letizia.

4           Will Counsel please state their appearances.

5           MR. McMAHON:  Yes, good morning, your Honor.  James

6   McMahon and Olga Zverovich for the United States.  Also on the

7   telephone is Jeffrey Coffman, Assistant United States Attorney,

8   as well.

9           THE COURT:  All right.  Good morning to you all.

10          MR. COFFMAN:  Good morning.

11          MS. ZVEROVICH:  Good morning, your Honor.

12          MR. HAFETZ:  Good morning, Judge.  Frederick P. Hafetz

13  and George Weinbaum for Defendant.

14          THE COURT:  Good morning, all.  Please be seated.

15          Good morning again, Tabitha.

16          THE COURT REPORTER:  Good morning.

17          THE COURT:  All right.  So my copy of the PSR on the

18  screen just went blank, so let me give it another go.

19          (Brief pause)

20          THE COURT:  All right, so we're here for sentencing.

21  The pre-sentence report I read was last revised on August 2nd of

22  2021.  Is that the most recent report you all have?

23          MR. McMAHON:  Yes, your Honor.

24          MR. HAFETZ:  Yes.

25          THE COURT:  Okay.  And in terms of the submissions,

1   that means the Defense submission, which was filed on May 4th of

2   this year, I have read, and then there were a series of letters

3   that were attached as exhibits.  I have read them all.  And then

4   there was also a reply that was filed, Mr. Hafetz, you filed it,

5   on May 17th.

6            Is there anything else I should have read on your

7   client's behalf?

8            MR. HAFETZ:  No, your Honor.

9            THE COURT:  Okay.

10           And the Government, I read your submission that was

11  filed on May 11th of this year.  Is there anything else I should

12  have read on the Government's behalf.  Well, I guess the victim

13  statements.

14           MR. McMAHON:  Yes, the victim statements, right.

15           THE COURT:  So two sets of those.

16           MR. McMAHON:  I have three actually.

17           THE COURT:  Okay.

18           MR. McMAHON:  I have one that was sent to the Court on

19  April 28th.

20           THE COURT:  Yeah, I don't have the dates that they

21  were sent because I just basically have downloaded them.

22           (Brief pause)

23           MR. McMAHON:  I have the one that was sent on November

24  29th.

25           THE COURT:  Let me say again...

1          MR. McMAHON:  Oh.

2          THE COURT:  I don't know the dates.  What I said was

3   is I just downloaded the documents themselves because they have

4   been filed.

5          MR. McMAHON:  Perhaps the best thing to do is --

6          THE COURT:  The November 1 may be the one I don't

7   have, so can you hand that up?

8          MR. McMAHON:  Yeah.

9          THE COURT:  Great.  Thanks, Mr. McMahon.

10         You know, actually, I have this one, I think.  Yeah, I

11   have this one.

12         MR. McMAHON:  Let me hand up another one, Judge.

13         THE COURT:  Okay.

14         MR. McMAHON:  For the record, dated November 19th.

15         (Brief pause)

16         THE COURT:  Yep, I have this one.

17         MR. McMAHON:  Let me hand up a third, Judge.  For the

18   record, dated April 28th of this year.

19         (Brief pause)

20         THE COURT:  All right, I have this one, too, so I

21   misspoke because I have them all.  All right.

22         All right, so having read those, is there anything

23   else I should have read on the Government's behalf, Mr. McMahon?

24         MR. McMAHON:  No, your Honor.

25         THE COURT:  Okay.

```
 1              Mr. Hafetz, have you had a chance to go over the
 2  pre-sentence report with your client?
 3              MR. HAFETZ:  Yes, your Honor, we have.
 4              THE COURT:  Are there any objections to resolve?
 5              MR. HAFETZ:  We filed a short letter to Probation
 6  about a bunch of months ago, and what we stated was in there,
 7  some of them were word corrections, we objected to the Probation
 8  PSR statement about adverse health reactions to the product that
 9  was manufactured.
10              THE COURT:  So let me ask again, are there any
11  objections we need to resolve.
12              MR. HAFETZ:  Oh.
13              THE COURT:  Because I know Probation did resolve some
14  of them.
15              MR. HAFETZ:  I don't think so.
16              THE COURT:  Okay.
17              Mr. McMahon, have you read the report?
18              MR. McMAHON:  I have, your Honor.
19              THE COURT:  Are there any objections?
20              MR. McMAHON:  No, your Honor.
21              THE COURT:  All right, then.  I'll adopt the factual
22  findings therein.
23              All right, so, Mr. Hafetz, I propose to hear from you
24  first, and then the Government, you can reply to anything that
25  is said on the Government's behalf.  Otherwise, Mr. Letizia has
```

1  the opportunity of the last word if there's anything he'd like

2  to say.

3           Mr. Hafetz.

4           MR. HAFETZ:  Sure, thank you.

5           Your Honor, I would -- I know your Honor has read the

6  submissions very carefully, but there are certain things that I

7  would like to emphasize.

8           THE COURT:  Please.

9           MR. HAFETZ:  First, with respect to the guidelines

10 themselves and their relevance with respect to the sentencing

11 proceeding, your Honor is as familiar, more familiar than I am,

12 with the sentencing juris prudence in this Circuit and District.

13 With respect to the -- what weight should be given to the

14 guidelines, I would just say I believe it's quite clear the

15 Court has great discretion to sentence other than, below the

16 guidelines, and with regard to the fraud loss calculation as a

17 factor in the calculation of the guidelines, there are many

18 decisions in this District in the Court of Appeals which caution

19 against and are quite critical of the guideline reliance on the

20 loss figure in the fraud tables as a driver of the sentencing.

21           Judge Lynch stated in *Emenrigger* (ph) case when he

22 presented on the District Court that it is a weak indicator of

23 the moral seriousness of the offense.  Judge Rakoff's opinions

24 in *Gupta* and *Adelson* are quite critical of the fraud loss table.

25 I believe Judge Rakoff's words were that it's a fetish of the

1   guidelines with arithmetic that leads to travesty of justice

2   with respect to the emphasis on the guidelines.  They have been

3   criticized by other District Court judges.  The Court of Appeals

4   in the *Algame* (ph) case was critical of reliance on the fraud

5   tables with respect to having a prominent place with respect to

6   the sentencing because of the bizarre and utter, as Judge Rakoff

7   says, of the fetish with the arithmetic in the loss.

8           THE COURT:  So I think one of the fair criticisms of

9   the guidelines is that, right, it does focus on a number, and

10  the number, of course, doesn't always tell the story of the

11  case.  Fair point.  And one of the particular vulnerabilities of

12  the guidelines is it captures this notion of intended loss,

13  right?  So if somebody intends to be involved in a $100 million

14  scheme, then the defendant is potentially on the hook for

15  guidelines purposes for an intended loss of $100 million, even

16  though nobody lost anything.  That's not what we have here, all

17  right?  This is actual loss to the tune of millions of dollars,

18  north of $40 million, so I'm trying to understand how a loss

19  amount, an actual loss amount, somehow reflects a fetishness for

20  numbers, because that's a really whoppingly high number.

21          MR. HAFETZ:  It's a high number, your Honor, but the

22  judges who -- in the *Adelson* case, the loss figure, I think, was

23  equal to that amount, a stock fraud case with respect to Judge

24  Rakoff.  I think notwithstanding whether it's intended or not,

25  the loss figure in itself, because of the way the tables are set

1   up on the loss table, I think notwithstanding that, courts are

2   still critical of the amount of the loss as the driver of the,

3   of the sentencing, and I think that goes along with the juris

4   prudence in the District stating that the -- an extremely

5   important factor on the guidelines sentencing are the

6   consideration of the individual's entire life, his good deeds.

7           THE COURT:  Of course.  I mean, but that's a separate

8   question, right?  Because the guidelines are only one part of

9   the 3553(a) analysis, and no one disputes that.

10          MR. HAFETZ:  Right.

11          THE COURT:  Your point is that looking at the

12  guideline as it relates to fraud by itself, the guideline itself

13  is flawed, right?  In addition to the argument that says, and I

14  know you've quoted Judge Rakoff in your papers --

15          MR. HAFETZ:  That, that --

16          THE COURT:  Let me just finish.

17          -- is that -- so there's no question there's a

18  holistic approach.  I'm just trying to understand how this case

19  fits into some of the criticism that relates to the guideline

20  calculation of loss when there's no actual loss, right?  It's

21  just an intended loss.  Whereas here, in terms of, you know, the

22  moral -- sort of the morality/immorality of the conduct, you

23  know, it's fair to say when someone actually causes $40 million

24  of loss, that they're more culpable than someone who only

25  intends to cause $40 million of loss, but doesn't actually cause

1   that loss.

2           MR. HAFETZ:  Well, I think that's true, your Honor.

3           THE COURT:  Okay.

4           MR. HAFETZ:  But in terms of the heavy, heavy reliance

5   as the driver, I mean, there is no explanation in the guidelines

6   as to why they settle on these figures at all, why they pick

7   this at level -- table...level 33 or level 31 or whatever the

8   level, there's no explanation at all for it, so I'm not saying

9   the loss figure, that actual loss, is different than intended

10  loss, for sure it is, but in terms of the fixation and the

11  driver as to the guideline determinate, I think it is still

12  criticized with respect to, to that.

13          THE COURT:  Okay.

14          MR. HAFETZ:  But beyond that, with respect to the

15  determinant of the relevant factors with regard to sentencing, I

16  would turn to what Judge Rakoff stated in *Gupta,* which is when

17  it comes time for sentencing, the guidelines take second place

18  to § 3553(a) of the sentencing guidelines, namely the history

19  and characteristics of the defendant.

20          THE COURT:  That's actually not the law.  The law is

21  that the guidelines are among the factors that are to be

22  considered and a judge is to weigh all of the 3553(a) factors.

23  Sometimes the guidelines might be...seventh place, right?

24  Because a judge might find that there were other of the 3553(a)

25  factors that have more weight in a particular case.  The point

1    is that you take all of the factors and you make an

2    individualized determination, including considering the

3    guidelines and the personal history and characteristics of the

4    defendant and all of the factors listed therein.

5              Right?

6              MR. HAFETZ:  Yes, all of the factors --

7              THE COURT:  Right.

8              MR. HAFETZ:  -- the starting point for calculation of

9    the guidelines, and then the 3553(a) factors come into play,

10   and, as I stated in the *Gupta* opinion, and I think it's quite

11   important here, Judge Rakoff stated there that the guidelines

12   take second place to the history and characteristics of the

13   individual.  I think the full quote, I think he expanded on it

14   in *Adelson,* is how can it be otherwise.  Because all the great

15   systems in the world, the religious systems, the moral systems,

16   the values, all place great weight with respect to the whole

17   person, the holistic approach, and surely on the day of

18   sentencing, the good that a person has done, as well as the bad,

19   the charge weighs heavily with regard to the discretionary

20   decision.

21             THE COURT:  That's just not -- I...I mean, that's

22   always been true.  Pre guidelines, post guidelines, of course,

23   the whole person's life history has to be considered.  I mean,

24   no one's disputing that.  But it's only among the factors that

25   are in 3553(a).  Because 3553(a), I don't get to just say

1   percentage history and characteristics of the defendant and stop

2   there.  I have to consider alternatives to incarceration.  There

3   are all kinds of factors.

4            MR. HAFETZ:  Well, for sure.

5            THE COURT:  So I don't know what we're talking about

6   here.  Let's just apply the factors to this case.

7            MR. HAFETZ:  Yes.

8            THE COURT:  I think that that's what we should get to,

9   right?

10            MR. HAFETZ:  Yes, your Honor.  I just -- this is a

11   preface, I believe we're in agreement, your Honor, that the good

12   someone has done -- obviously there are other factors that have

13   to be considered, of course.

14            THE COURT:  Of course.

15            MR. HAFETZ:  But the good the person has done is

16   extremely significant with respect to the sentencing here.

17            And with regard to Mr. Letizia, I think he has done

18   exceptionally good deeds that exhibit in his lifetime, I think,

19   a concern and a devotion to other persons, and I believe the

20   letters that we have submitted to the Court, your Honor,

21   extremely well depict what Mr. Letizia has done in his lifetime.

22            I would start -- and I'll refer to the letters briefly

23   because I know --

24            THE COURT:  Sure.

25            MR. HAFETZ:  -- your Honor has read them.

1          THE COURT:  I've read every one, but please feel free

2  to repeat it.

3          MR. HAFETZ:  But in my mind anyway, and I've been

4  doing this for a long time, Judge, I haven't had too many

5  defendants who appeared before sentencing, really, who were

6  involved in saving a life, let alone three lives, and in this

7  case, we have an individual who really did, according to the

8  letter writer, save three lives.  That's exceptional.  It's

9  important.  In fact, I think it's highly significant.

10          He saved the life of his mother when he was a young

11  person.  In fact, that when he was young, the Government in its

12  letter, in its submission, somewhat discounts this because it

13  was a long time ago, but that obviously, I think, is not

14  entitled, that view, any weight with regard to what we're

15  talking about now, which is, as we both agreed, I think, before,

16  we consider the whole man and his entire life, and you can't

17  read it out of 3553(a) that it happened a long time ago.  He

18  saved his mother's life.  It's a big deal.

19          And the letter of his, his friend who is sitting here

20  in the courtroom today, your Honor, it's the letter, if I may

21  refer to it...I think it is Exhibit 5 to our submission, Jerry

22  Koshell.  Mr. Koshell is an individual who spent pretty much a

23  lifetime of teaching in the New York City school system.  Mr.

24  Koshell unfortunately encountered later in life a series of

25  debilitating physical ailments which led to extreme emotional

1  distress and emotional concerns in his lifetime.  Mr. Letizia

2  was his neighbor for many years.  And Mr. Koshell states, he

3  puts it succinctly in his letter, he said if it wasn't for Mr.

4  Letizia, he wouldn't be here today, he wouldn't be alive.

5         What did Mr. Letizia do?  Mr. Letizia, not because he

6  had money and he was spending money as the Government suggests,

7  these were good deeds that a wealthy person does, but because of

8  his innate decency and his innate kindness and concern about

9  others, would spend hours and hours and hours over many days

10 with Mr. Koshell, would speak on the telephone all hours of the

11 night when Mr. Koshell was in extreme distress, and it was

12 really because of this kindness that Mr. Letizia displayed that

13 Mr. Koshell says that he really pulled through and made it

14 today.  I think that's a big deal.  I think it's a big deal that

15 Mr. Letizia did that with respect to what we're talking about

16 now, the 3553(a) factor of history and characteristics of an

17 individual.

18        Yet, there's a third person who's also in the

19 courtroom today, Christina Andropoulis who writes with respect

20 to what Mr. Letizia did for her.  Ms. Andropoulis, an individual

21 who is a successful business person, in addition, lives in

22 Massachusetts as she states.  She's also appointed to several

23 respected positions by Massachusetts state authorities with

24 regard to governmental positions.  She writes in her letter with

25 respect to how on a business trip to Western Africa, I think it

1  was Liberia, I believe, she was kidnapped, and she states that,

2  her word, it's her word, Mr. Letizia was instrumental,

3  instrumental, in obtaining her release from kidnappers who she

4  feared might kill her.

5       So three occasions throughout his life, none of them

6  having anything to do with money, you know, Mr. Letizia saved --

7  was instrumental in saving the lives of three persons.  I don't

8  know many people that I've come across who have done that,

9  Judge.  I couldn't say one time even for myself, but I think

10 this is -- if there was ever a time where this was significant,

11 I think it's at this time, on judgment day, when we're judging a

12 whole person and weighing the good deeds against the bad deeds,

13 and I think it's extremely significant with respect to the

14 nature of the individual who is going to be sentenced.

15      And there are the other letters that talk about the

16 exceptionally kind and good deeds that Mr. Letizia did.  There

17 are the letters from the children of the woman -- two women with

18 whom Mr. Letizia had long-term serious relationships at

19 different times, long after he had been divorced from his first

20 wife.  Two of the children, Neema and Navid, in their letters

21 talk about how after Mr. Letizia separated or ended the

22 relationship with the mother at what they call a very delicate,

23 fragile time in their growing up period, Mr. Letizia continued

24 to be devoted to them.  He stayed in their life and they

25 recognized it.  Neema writes in her letter about how Mr. Letizia

1  knew how much he was needed in her life and he stayed there for

2  her -- in his life at that time.  In fact, he states "he knew I

3  needed him the most through that time and our relationship did

4  not miss a beat."  The sibling, Neema, writes a similar letter

5  with respect to that Mr. Letizia was not walking away,

6  understood the importance of him keeping a bond, a close

7  relationship, and a support, emotional support, to these

8  children even though he had ended the relationship with their

9  mother.

10         More striking, actually, is the letter of their

11 cousin, Kyle Giannotti.  Kyle is an individual, as he states in

12 his letter, who at -- was born in Iran, mother died when he was

13 eight, moved here with his father from Iran, and as he -- when

14 he was in high school in Connecticut, his father had to go back

15 to Iran and stayed there while he lived alone in Connecticut.

16 And he writes very poignantly about how Mr. Letizia went out of

17 his way to include Kyle, along with Neema and Navid, in terms of

18 his devotion and to his well-being.

19         He writes, he states in his letter, "from day, one

20 Gabe made it his mission to be a father figure in my life," and

21 he states that "Gabe only cared about the three of us having a

22 good time.  He would sacrifice anything just to see smiles on

23 our face."  I think what these letters talk about -- and there's

24 a similar letter from Shelley, the daughter of the other woman

25 with who Mr. Letizia had a long-term relationship, in terms of

1  how he played an extremely important role in her life after he

2  had broken up with her mother.  I think these speak a lot about

3  Mr. Letizia's devotion and concern for others and basically his

4  humanity, and I think these letters are quite, are quite

5  important.

6          There are other letters which talk about -- many of

7  them refer to various good deeds that Mr. Letizia did; providing

8  jobs for people who needed jobs, helping out financially with a

9  cancer victim, helping provide money for persons who needed

10  hare-lip surgery, persons who were on hard times, and generally

11  how supportive Mr. Letizia was.  I think many of them say that

12  Mr. Letizia would never turn his back on anyone when anyone

13  needed a favor, and I think this is kind of the core of Mr.

14  Letizia's -- of who Mr. Letizia is.

15          Obviously Mr. Letizia has committed a fraud, a

16  substantial dollar amount of fraud, but I think when we talk

17  about the guideline factor -- I'm sorry, the sentencing factor

18  of 3553(a), good deeds, and we talk about the holistic person, I

19  think what we see here is a person of great humanity, kindness,

20  and devotion to others, and I believe that this is a quite

21  significant factor with respect to the sentencing of Mr.

22  Letizia.

23          With regard to other factors, your Honor, we've

24  addressed them in a letter.  The Government in its submission

25  referred to some other factors.  We deal with them in the

1  letter.  They talked about finding an allegation of a hidden

2  million dollars in cash.  We addressed that in our reply.

3          With regard to the allegation of health consequences,

4  which I think is important, I mean, we're talking about a fraud,

5  but the Government -- obviously it's a large fraud, but the

6  Government here, in terms of describing the fraud, adds to it,

7  attempts to add to it, that there were adverse health

8  consequences with respect to that.  I think that's an empty

9  allegation by the Government, there's no support for it, and,

10 indeed, the Government conduct with respect to that is to the

11 contrary, because had the Government believed there were adverse

12 health consequences, the Government would have taken action back

13 in 2017 when the FBI and the FDA began to investigate and began

14 to learn from witnesses who were cooperating of the basic

15 allegation of testing less than the number of people that the

16 manufacturers had paid for.  The Government did nothing with

17 respect to that.  They let AMA operate for the next several

18 years.  They brought no action of any attempt to try to shut it

19 down, to prevent them to continue the...the business that they

20 were doing, so for the reasons that we state and the other

21 reasons as well that we state in our reply, I believe there is

22 no support for that allegation or to makes that a factor with

23 regard to the sentencing in this case.

24          Finally, your Honor, I'll just mention briefly, there

25 is a plea to a felony, five years, and two misdemeanor counts

1  that were added by the Government as part of the plea agreement

2  makes a total of a seven-year potential.  I understand

3  misdemeanors carry with them jail sentences.  I think the

4  gravamen here of the charge is the five-year charge and with

5  regard to the sentencing.

6          So in sum, your Honor, your Honor's quite correct,

7  obviously it's a large fraud.  Forty-plus million dollars is a

8  large number for sure.  Your Honor has to decide what kind of

9  sentence to give to Mr. Letizia.  It's an extremely difficult

10 task.  However, I think in this case, Mr. Letizia as an

11 individual throughout his life has demonstrated a level of

12 humanity, compassion, decency, and care for other human beings

13 that weighs heavily in the scale of what sentence should be,

14 should be meted out to him today.

15         He stands before the Court a 72-year-old man, broken

16 man.  I mean, he's humiliated, he's lost his business, he will

17 have a debt that in no way will he ever be able to pay off even

18 if he lives for 160 years or more and he is -- his assets are

19 virtually depleted, so we would ask the Court, as we said, we've

20 asked the Court to sentence Mr. Letizia to a period of home

21 detention or, alternatively, a sentence no greater than one year

22 in prison, your Honor.

23         THE COURT:  Thank you very much.

24         Mr. McMahon.

25         MR. McMAHON:  Yes, your Honor, thank you.

1          A lot has been said in the sentencing memo and in the

2    PSR about this being a massive fraud that lasted for decades and

3    how much money the Defendant made off of it, and I don't need to

4    go into all of that because it's been covered, but I just wanted

5    to highlight two other points that I believe set this case apart

6    from other fraud cases, and the first thing is, one of the

7    things that Mr. Hafetz was just talking about, is the issue of

8    the risk to public health from the Defendant's conduct.

9          We basically agree on the facts.  As we said in our

10   sentencing memo, the only adverse reaction that we're aware of

11   was redness to the skin on some people that used these products

12   that didn't last for more than 24 hours.  So those are the

13   facts; we agree on that.  Where we disagree is on how we see

14   that risk.

15         You know, the AMA's clients wanted fifty panelists or

16   a certain number of panelists on these various studies for a

17   reason.  They needed that number, whatever that number was that

18   they agreed to and paid for, because they needed that number of

19   people to be tested in order for the test result to be reliable,

20   and when I say reliable, these clients, the 240 victims here,

21   relied on these test results to sell their products around the

22   world, the sunscreens and the cosmetics and the perfumes and all

23   of that, and these are large and -- large and very reputable

24   manufacturers, these are manufacturers that you've heard of, and

25   they are literally selling these products all throughout the

1  world.

2          As we know, these tests weren't reliable.  At all.

3  And as a result -- you know, and this went on for decades, as I

4  said, and as a result, we also know that the Defendant also

5  suppressed some adverse test results.  Not all adverse test

6  results, but some of them that were never then reported to the

7  client.  He did this to make money, as we know, and in doing

8  that, in our view, he exhibited just a very, very callous

9  disregard for the risk he was taking to public health.  There

10 was a risk here.  We're very, very lucky that there weren't any

11 more results or impact of it that was more serious than what it

12 was.

13          THE COURT:  That we know of.  I mean...

14          MR. McMAHON:  And that we know of, also.

15          THE COURT:  To the extent that -- because it's the

16 companies, sure, that they are worried about their reputation,

17 but it's the consumers that depend on the representations about

18 the product, so if some parent is buying SPF50 for their kid,

19 they expect it to protect their kid from the sun, we all know

20 the dangers now of being exposed to the sun and ultraviolet

21 rays, and it turns out it's an SPF25, then we don't know how

22 that may have affected...

23          MR. McMAHON:  Right, and we may not know for decades.

24          THE COURT:  Right.

25          MR. McMAHON:  It's something that --

1           THE COURT:  I mean, we can't tie that in to AMA's

2    testing as opposed to anybody else's, because it's not as if

3    people can say, "well, on this date, I used this sunscreen and

4    that's what caused whatever skin problems I had thirty years

5    later."

6           MR. McMAHON:  Right.  Right.  So to us, there was just

7    a risk here, and the fact that the Defendant has disregarded

8    that risk for money, I think that tells you something about his

9    history, his character, and it goes also to the nature and

10   circumstances of the offense.

11          The other issue is the hidden $790,000 receivable.

12          The Defendant said in a letter that was filed on

13   Monday that he should have disclosed this receivable, but he

14   didn't because in his mind, it was not an asset, and that is

15   just not credible.  It's his largest asset by far and it

16   represents a stream of income to him that is scheduled to come

17   to him over the next thirty years and is scheduled to come from

18   somebody who is now operating what is essentially the successor

19   to AMA.

20          The idea that the Defendant would sell all of his

21   business assets and then walk away and not attempt to collect on

22   it or not expect to be paid on it isn't -- just isn't credible.

23   You know, if he had to, he could sue on it, he could get all the

24   equipment back from the guy he sold it to who wasn't paying for

25   it and turn around and sell it to someone else, and maybe he

1  couldn't get $790,000, but he could get maybe $400,000 or

2  something or he could get something for it.  He's just not going

3  to walk away from that which is still an asset to him.  It just

4  doesn't make sense and it's just not credible.  But what does

5  makes sense and what is believable is that he didn't tell

6  Probation about it because of what Mr. Hafetz just referred to.

7  He is now facing massive debts as a result of this case and he

8  just didn't want to pay that, so he hid the asset instead.

9          Most defendants, I have found, in this defendant's

10 situation where he's awaiting sentencing don't lie to Probation.

11 That's a huge risk.  It's a huge risk to lie about your assets

12 because we're going to go out and find it, which is what we did

13 here, and when you find that, it just doesn't look good in court

14 obviously, so that's why they don't want to take that risk.  But

15 this defendant did, and it tells you about his character and it

16 tells you about a lack of remorse here and it tells you that

17 he's not going to adjust well to supervision at all.

18          So I think that puts him at a different category, I

19 think, than most defendants and it shows the need, I think, for

20 a significant sentence here, so that's why we're asking for

21 what's effectively become the guidelines sentence of 84 months.

22          MR. HAFETZ:  Your Honor, if I may?  Just briefly?

23          THE COURT:  Yes, of course.

24          MR. HAFETZ:  Yeah, with regard to the adverse, the

25 health risk, there's several significant things I point out.

Sentencing                    USA v. Letizia                    23

```
 1              The Government points to, because they can, any
 2   requirement that there be a certain number of people tested for
 3   health efficacy reasons.  The reason is there is no regulation,
 4   there is no requirement by the FDA --
 5              THE COURT:  Well, but the customers had a protocol
 6   that they wanted his company to follow, right?
 7              MR. HAFETZ:  That's, that's true, and that's the
 8   fraud.
 9              THE COURT:  The companies, they ask for those
10   protocols because in their experience, that -- those protocols
11   give them some comfort level in the accuracy of the testing
12   that's done.
13              MR. HAFETZ:  Well, that may be the case, they wanted
14   to do an excessive number, but that doesn't --
15              THE COURT:  No, not excessive -- now you're making
16   that up.  You have no idea if that's an excessive number.
17              These are companies that presumably have some
18   experience in the development and testing of their product, and
19   they also need to be able to market their products with some
20   level of integrity that their customers can take satisfaction in
21   what they represent the products to do, that the products
22   actually do that, so they create testing protocols, they pay
23   companies like your clients a lot of money to follow these
24   testing protocols, for a reason.
25              Are you disputing that?
```

Sentencing                    USA v. Letizia

```
 1             MR. HAFETZ:  The -- no question they asked for a
 2   certain number of customers be tested, but in terms of whether
 3   there was -- whether Mr. Letizia thought there was a health
 4   risk, he did not believe there was a health risk, no.
 5             THE COURT:  But why does he get to decide on his own
 6   protocols without telling the people who are paying a lot of
 7   money that he's not following their protocols?
 8             MR. HAFETZ:  Well, that's the fraud, and that's what
 9   --
10             THE COURT:  Correct.
11             MR. HAFETZ:  -- he pled guilty to.
12             THE COURT:  So, but, again, presumably these companies
13   have these protocols in place for a reason, because they want
14   the testing to be reliable.
15             MR. HAFETZ:  Your Honor, I would say the other way --
16             THE COURT:  And when somebody gets paid money to
17   follow those protocols and doesn't follow them, shouldn't he
18   tell the company so they can understand that their protocols
19   aren't being followed and so maybe the testing isn't as reliable
20   as they want it to be?
21             MR. HAFETZ:  And that's the fraud, but in terms of --
22   we're talking about a different issue, though.
23             THE COURT:  No, we're not.  Because the point of the
24   testing protocols is so that the testing can be reliable, so
25   they can satisfy themselves and their customers that the
```

1  products are what they say they are.

2         MR. HAFETZ:  But it, it -- the FDA is the agency that

3  deals with that area, and there's no requirement for this kind

4  of testing by the FDA.  Mr. Letizia was aware of nothing,

5  nothing that --

6         THE COURT:  He was aware of what the protocols were

7  that he was being paid money to follow, right?

8         MR. HAFETZ:  The internal company protocols, not as a

9  matter of safety, required by U.S. law or --

10        THE COURT:  I see, so --

11        MR. HAFETZ:  -- regulation.

12        THE COURT:  -- when a company -- we all understand

13 that the purpose of sunscreen, among others, is to protect

14 people from getting things like skin cancer, right?

15        MR. HAFETZ:  Yes.

16        THE COURT:  And when you're looking to buy for

17 yourself or a loved one and you see SPF 50, you're, like, okay,

18 SPF 50 is more protective than SPF 15, right?

19        MR. HAFETZ:  Yes.

20        THE COURT:  Okay.  And how is it that they know that

21 it protects at the level of SPF 50?  Well, they get testing done

22 on the product to see if it, in fact, does protect at that

23 level, does it protect at that level for the number of hours

24 that they say it does, does it protect at that level for the

25 number of hours even when exposed to water that they say it

1  does, and to do that, they have protocols.

2          Forgetting the FDA, they have their own protocols to

3  make sure that they can satisfy themselves and there are

4  literally thousands and thousands of customers that it protects

5  at the level that they say it does, and they paid a lot of money

6  to your client and he didn't follow the protocols and he didn't

7  tell them he wasn't following the protocols.

8          MR. HAFETZ:  That, that's correct, your Honor, but it

9  doesn't mean that he believed that he was creating a safety

10 risk.  There was nothing for him in the literature or anywhere

11 that would tell him that this was a safety risk.

12         THE COURT:  I see.  So he decided on his own that the

13 protocols were worthless.  Right?

14         MR. HAFETZ:  I think -- I think we're talking about

15 two different issues, your Honor.  We're --

16         THE COURT:  No, they're not.  They're the same issue.

17         MR. HAFETZ:  I see it as he defrauded them with regard

18 to the number of testing, but as to whether he believed that he

19 was putting at risk --

20         THE COURT:  It's not a question even of belief, it's a

21 question of foreseeability, and at the end of the day, he's not

22 the one who makes the decision on the protocols, it's the

23 customer who's paying the money that says do the testing

24 consistent with these protocols, period, end of story.

25 Otherwise, he shouldn't take their money.

Sentencing                     USA v. Letizia

1              MR. HAFETZ:  That's, that's true.

2              THE COURT:  Okay.

3              MR. HAFETZ:  That's true.  But in terms of did he

4  believe that he was creating a health risk, your Honor, I don't

5  believe so, I don't believe there's anything --

6              THE COURT:  And why should we take that self-serving

7  representation to have any value here today?

8              MR. HAFETZ:  Because of the absence of any FDA rule or

9  regulation whatsoever that says that that amount of testing is

10  required.

11              THE COURT:  I see.  So in other words, the companies

12  literally just make up these protocols for no reason whatsoever.

13              MR. HAFETZ:  Your Honor, they, they, they may want to

14  ensure -- can I have just one minute, your Honor?  May I just

15  consult?

16              (Counsel consults with Defendant)

17              MR. HAFETZ:  Your Honor, just several points I would

18  like to make.

19              THE COURT:  Please.

20              MR. HAFETZ:  My understanding is that with regard to

21  testing, this was not uniform by all manufacturers, that they

22  did not all require that number of testing.  Some wanted less

23  testing than others did.  The reason for that being, I think,

24  that there was no regulation with respect to the number.  And

25  the other is with respect to the FDA was part of this

1   investigation.  Back in 2017, the Government acquired the

2   information then with respect to the fact that for some

3   manufacturers, less testing was being done for SPF product than

4   was being paid for on the product that was then put out on the

5   marketplace, but the Government, including the FDA, which was

6   part of the team, never did anything to try to shut down or stop

7   AMA from doing this.  If the Government had been convinced that

8   Mr. Letizia was creating a health risk when he became aware that

9   some manufacturers were getting less testing than they asked for

10  and the Government knew at the same time that many manufacturers

11  were not asking for the same number of tests that other

12  manufacturers were, the Government did nothing about it.

13          Mr. Letizia knew the investigation was going on in

14  2017.  No one ever said "you're creating a health hazard."

15  There was no action against it.  I find it difficult to accept

16  that Mr. Letizia thought or believed he was creating a health

17  hazard, and I find it difficult to believe that in the

18  manufacturers of this product across the country it was a given

19  that if you didn't have this amount of testing, you were going

20  to endanger the children of people who were buying sunscreen,

21  because I don't think that's the fact that.

22          THE COURT:  Nothing more noble than blaming somebody

23  else.  Right?  Okay, this is the FDA's fault.  For thirty years

24  he was taking money he didn't earn, not following testing

25  protocols he was paid to follow, and part of it was to find out

1   if people had allergic reactions to the product, if there was

2   some other adverse effect of the products, and whether the

3   products performed as they were going to be advertised to

4   perform.  That's what he did for a living.  And people relied on

5   that, companies and people who bought the products from these

6   companies, so the notion that you find it hard to believe that

7   he wasn't aware that the failure to follow testing protocols

8   might actually have an adverse health impact on people I find

9   hard to believe.

10          MR. HAFETZ:  Your Honor, the number varied from

11  manufacturer to manufacturer, there's no rule --

12          THE COURT:  Of course it did, but it doesn't mean it

13  wasn't foreseeable that failing to do proper testing wasn't

14  going to have an adverse health effect on people who bought

15  products that involved their health.  It's absurd to say that

16  this was not foreseeable.

17          MR. HAFETZ:  Your Honor, I -- if the numbers vary

18  amongst the manufacturers, if not -- why not a hundred, why not

19  two hundred?  I mean, if one manufacturer --

20          THE COURT:  Well, okay, but that's up to -- if he

21  wants to suggest that, fine, but he wasn't following the

22  protocols that he was being paid to follow.  It's as simple as

23  that.

24          MR. HAFETZ:  That's true.

25          THE COURT:  And the notion that not following these

1   protocols might not have some adverse effect on people, it's

2   just, it's just not believable.

3           MR. HAFETZ:  All right, your Honor.  I don't think we

4   have anything other to say than that I don't believe Mr. Letizia

5   thought he was creating a health risk, your Honor.

6           THE COURT:  Okay.  Do you want to address this point

7   because I meant to ask you about this, Mr. McMahon, which is

8   that the FDA dropped the ball here.

9           MR. McMAHON:  Well, Judge, first of all, we did a

10  search at AMA.  We got all the records.  It was a voluminous

11  amounts of records and it took time for us to figure out --

12          THE COURT:  When was the search done?

13          MR. McMAHON:  In 2017.

14          THE COURT:  Okay.

15          MR. McMAHON:  So it took time for us to get it and

16  figure out what was going on.  When we did, we spoke through an

17  indictment and we issued a press release to that indictment, and

18  that is how the victims found out what was going on.  At which

19  point, then they were able -- some of them, as you've read in

20  the impact letters, had to withdraw products, they had to

21  postpone introduction of new products, but they took action, the

22  responsible ones, to make sure that --

23          THE COURT:  Because they were concerned their products

24  weren't performing as they said they were performing.

25          MR. McMAHON:  Right, and, I mean, they had to

1  literally pull them off shelves in some instances.  But they did

2  that, and that's part of the costs that we're looking at now.

3              THE COURT:  Okay.

4              MR. McMAHON:  The other thing is that it is my

5  understanding that I learned when I first came on this case that

6  there are industry -- not regulations, but there are agreed-upon

7  standards...

8              THE COURT:  Right.

9              MR. McMAHON:  For how many panelists you have to have,

10  and that's why the customers or the clients chose the number

11  that they wanted.

12             THE COURT:  Well, and the proof of that is that when

13  they found out they weren't being followed, they pulled the

14  products or delayed introduction of products until they could

15  get them properly tested.

16             MR. McMAHON:  Right, that's right.

17             MR. HAFETZ:  Your Honor, just with regard to the

18  agreed-upon standards, I don't know what those are.  I haven't

19  seen anything with respect to that, any rule, regulation, as --

20  by the agency in charge of this saying that there are

21  agreed-upon -- so I understand the fraud point, but with respect

22  to the statement about agreed-upon standards, I don't know where

23  that is.

24             THE COURT:  Okay.

25             All right, Mr. Letizia, is there anything you'd like

1    to say before sentence is imposed?

2              (Counsel consults with Defendant)

3              THE DEFENDANT:  I don't have anything beyond the

4    letter that I submitted to the Court, your Honor.

5              THE COURT:  Okay.  Which I have read.  Thank you for

6    that, Mr. Letizia.

7              The Court's task is to determine what sentence is

8    sufficient, but no more than necessary to achieve the goals of

9    the sentencing laws as they apply to Mr. Letizia and to his

10   case.  To do that, I have considered, as required, all of the

11   factors set forth in 18 U.S.C. § 3553(a).  In doing that, I

12   have, of course, considered the pre-sentence report, I've

13   considered the extensive written submissions of the parties,

14   and, of course, I've considered what everyone has said to say

15   here today.

16             The starting point, we are told, by higher courts

17   among the 3553(a) factors is the guideline calculation.  That is

18   set forth without objection at paragraphs 25 through 39 of the

19   pre-sentence report.  The guideline for violation of 18 U.S.C.

20   § 3371, which is the general conspiracy provision, is 2X1.1.

21   Pursuant to § 2X1.1(a), the guideline from the substantive

22   offense, plus any adjustments for such guidelines, are

23   referenced, so the guideline for conspiracy to commit wire fraud

24   is covered by § 2B1.1.

25             Because Mr. Letizia was convicted of an offense that

1   has a statutory maximum of less than 20 years, the base offense

2   level is 6.  That's pursuant to § 2B1.1(a)(2).  Because the loss

3   amount was $46,200,000, 22 levels are added pursuant to

4   § 2B1.1(b)(1)(L).  Because the offense involved ten or more

5   victims, two levels are added pursuant to § 2B1.1(b)(2)(A)(i).

6   However -- oh, and also, because Mr. Letizia was an organizer

7   and leader of the criminal activity that involved five or more

8   participants, four levels are added pursuant to § 3B1.1(a).

9   This all results in an adjusted offense level of 36, but three

10  levels come off because of Mr. Letizia's acceptance of

11  responsibility as reflected in his timely guilty plea, and

12  that's pursuant to §§ 3E1.1(a) and (b).  This yields a total

13  offense level of 33.

14          Criminal history score is zero, so Mr. Letizia is

15  comfortably in criminal history category 1.  At a total offense

16  level of 33 and a criminal history category of 1, the guideline

17  range is effectively capped by the statutory max of the charges,

18  so Count One of the statutory max is 5 years and Counts Two and

19  Three, it's one year each, so the guideline range is effectively

20  84 months.  It would be much higher if it wasn't for the

21  statutory caps that were in play here.  So that is the math.

22          And, Mr. Hafetz, I could not agree with you more that

23  the math does not come close to telling the whole story in any

24  sense, including the sentence of Mr. Letizia, and I also happen

25  to agree with you, and I guess Judge Rakoff, that the personal

1  history and characteristics of the person being sentenced are, I

2  think, primary among the 3553(a) factors that have to be

3  considered.

4          And, as I said, I read all of the letters, not just

5  your quotations from the letters, but all of the letters, and

6  there's no question that Mr. Letizia has been a great help to

7  many people in his inner circle, both family members and close

8  friends and people who are not officially family members, but

9  certainly were treated like family members, and I'm referring,

10  of course, to Neema and Kyle and Navid.  And I think those, to

11  me, honestly, those are the most compelling letters because

12  those were letters where Mr. Letizia is acting very much in a

13  father-like way to young people who very much needed a

14  father-like figure in their lives.  And it was not check

15  writing, it was actually helping provide guidance and support in

16  a situation where he was not required to do so, and I think it

17  was extremely commendable, and I thought that the letters were

18  heartfelt and they were filled with details that I think

19  certainly reflect the efforts that Mr. Letizia made one of the

20  individuals.

21          And there are plenty of other letters where Mr.

22  Letizia is said to have provided moral support, to be present

23  when people were dealing with personal crises, whether it was a

24  health issue, a family member's health issue, a divorce,

25  whatever it was, and it's not just limited to family members.

1    It also includes people who were a part of Mr. Letizia's circle

2    of friends.  And it is, of course, the case that persons should

3    not be evaluated by the moments they're committing crimes, they

4    should be evaluated in the entirety of their lives, and their

5    good deeds should be weighed against their misdeeds, which is,

6    of course, what I have done here.

7              And, yes, there is the rather complicated story of Mr.

8    Letizia's mother, who had some very serious challenges as a

9    mother.  The record is replete with stories of her struggling

10   with her own addiction issues that led her to be abusive.  Mr.

11   Letizia appears to have borne the brunt of that, and

12   notwithstanding that history, he comes to his mother's rescue

13   and not just saved her life, but he was willing to be engaged in

14   her life even after all of the difficulties he suffered early on

15   in life.

16             And I think, you know, the other examples, you know,

17   the Koshell example, the letter does say at the very end that

18   the person felt they were literally dying of exhaustion from

19   lack of sleep and Mr. Letizia basically is able to buy a CPAP

20   machine that was, I guess, better than all the others that had

21   been provided.  And then there's the rather, I mean, just an

22   incredible story about this kidnapping.  And it's a little murky

23   as to what Mr. Letizia did.  I mean, what it says is that

24   "whatever Gabe did, it frightened the kidnappers," so there's no

25   question that Mr. Letizia's life has been spent helping those

1  close to him.

2          I also think that the Government's comment on this is

3  not unfair that a lot of the help that Mr. Letizia is said to

4  have given involves spending money, so he takes people on trips

5  to India with him and he buys machines for them and this whole

6  kidnapping thing, who knows if the ransom is paid, who knows

7  what was done, but it's not a far leap to think that it involved

8  Mr. Letizia spending some of his ill-gotten gains.  And I do

9  think that one's charitable works, especially when they involve

10 money, in a case where the fraud is over $40 million, I think

11 it's fair to put an asterisk next to some of the philanthropic

12 efforts and some of the charitable efforts.  Again, I don't

13 think it explains away everything Mr. Letizia's done, but a lot

14 of his support has been financial, and that's commendable, but

15 it's not as commendable when it's money that he took by way of

16 fraud.

17          But I also think the Government, you know, makes some

18 other points about Mr. Letizia's character.

19          You know, there's the whole misrepresentation about

20 him being a doctor.  I mean, he just lived this lie and he

21 shared this lie with people to, no doubt, add to his credibility

22 as somebody who was going to be involved in testing products

23 that involved people's health.  There's this rather disturbing

24 story and lying about the assets sale, and this explanation, I

25 think, is just further example -- further evidence of Mr.

1  Letizia not being able to come to grips with the truth when the

2  truth hurts him, so if we're on the subject of character, I

3  think that that's something that also needs to be considered.

4          And I also think that in terms of the ledger of good

5  deeds and misdeeds, it's a more compelling case when someone has

6  spent a life helping people, when someone has spent a life in

7  public service, you know, people who serve in the military.

8  I've said this often, I think that is a relevant fact, but it

9  has more weight when it's compared to someone who commits a

10  crime in a momentary lapse of judgment.  Because that happens.

11  People, they give in to temptation in the moment and they

12  shouldn't be judged for that fifteen-second decision or a

13  momentary lapse of judgment.  This was a thirty-year fraud.  So

14  at the same time that Mr. Letizia, on the one hand, exhibits

15  great concern for some people in his life, he exhibits a callous

16  indifference to the people who he was serving in his

17  professional life.

18          And it's not just the companies that were paying a lot

19  of money to have these products tested, it was the people who

20  were buying these products, and as I said, it is entirely

21  foreseeable that a failure to abide by protocols, whether

22  they're FDA-required or not, the foreseeable consequence is that

23  people were not going to feel comfortable using these products,

24  were they going to cause adverse effects, were they going to

25  perform at the level that they were said to have performed.

1           And the proof of that is how the customers reacted

2   when they found out about AMA's deficiencies, systemic

3   deficiencies, in not complying with the protocols that good

4   money was being paid to follow.  They had to pull products from

5   the shelves.  They had to delay the introduction of new

6   products.  There were articles that came out that did studies on

7   products that had been AMA-tested to show that the SPF levels

8   were barely half of what they were represented to be.

9           And to finger-point to the FDA, which doesn't learn

10  about this, by the way, until after this investigation, the

11  search in 2017, that leads to people sort of reevaluating AMA's

12  products, AMA's tested products.  There's this article that the

13  Government cites in New Zealand in 2019, a shocking discrepancy

14  between what was supposed to be done in these products, the SPF

15  50, and what was actually done, and so, yes, it was entirely

16  foreseeable, and this was something that, as I said, Mr. Letizia

17  didn't do because he succumbed to temptation once, he made it a

18  part of his life, and it was this sort of almost Jekyll & Hyde

19  life of deep concern for people he knew and a lack of concern

20  for people who were being served by the company that was

21  supposed to be testing products for the benefit of consumers.

22           And as I said, the fact that the FDA didn't bring

23  charges earlier or the fact that there's no FDA rule on the

24  protocols is beside the point.  He knew what he was being paid

25  to do and he didn't do it, and he lined his pockets and he

1   financed, apparently, multiple trips to India and around the

2   world and fancy cars and God knows whatever else.  And, yes,

3   including CPAP machines and getting people freed from kidnappers

4   in Africa, but it's -- this was an entire life he led, he was a

5   career fraudster, and so when we talk about Mr. Letizia's

6   personal history and characteristics, that also has to be

7   weighed in addition to his good deeds.

8            Pivoting to the factors that require focusing on the

9   offense conduct, the need to impose a sentence that promotes

10  respect for the law, and provides for just punishment, accounts

11  for the seriousness of the criminal conduct, I've already said a

12  lot about this.

13           I mean, I think that this was not only a massive

14  fraud, it was a long-living fraud, it was a fraud that involved

15  a series of lies and misrepresentations, and these lies and

16  misrepresentations had a foreseeable consequence on people who

17  were using these products, people who were selling these

18  products.  Mr. Letizia's customers lost a lot of money because

19  of what they had to do in response to learning about his failure

20  to follow the protocols that they paid him to follow.

21           So even if it was not foreseeable that people might

22  get hurt, it certainly was foreseeable that the companies, his

23  customers, were going to lose money once it came out that their

24  products weren't being tested as they thought they were, and so

25  -- and as I said, this is not intended fraud, this wasn't a

1  conspiracy that didn't result in anybody losing money.  A lot of

2  companies lost a lot of money and a lot of people may have

3  gotten hurt in ways we'll never know, and that's a serious

4  thing.

5          Deterrence, general deterrence is certainly an issue

6  here and there's plenty of case law that talks about deterrence

7  specifically when it comes to white-collar crime, case law in

8  our Circuit.  I'm less focused on specific deterrence, I think

9  Mr. Letizia is very unlikely to do anything like this again, but

10 I think it needs to be said that people should understand that

11 even if they do good deeds, that they don't get a license to

12 commit fraud on a scale such as this, and I'm talking about the

13 dollar amount and on a scale in terms of the type of effects of

14 not owning up to his responsibilities, what he was paid to do,

15 and that's factor here.

16         And, of course, there's always consideration of the

17 factor to avoid unwanted disparity, and I've considered that as

18 well.

19         So my view is that the request from the Defense for

20 the sentence that's been suggested, I think, is not anywhere

21 close to being sufficient to achieve the goals of the sentencing

22 laws, even giving a great amount of weight to the letters that

23 have been submitted on Mr. Letizia's behalf.  They are just

24 outweighed by how galling this was, how long lasting it was, how

25 serious it was in terms of dollar amount, how serious it was in

1    terms of the ramifications for the companies and their thousands

2    of customers, and so that's why I'm not going to accept that

3    recommendation.

4            What I'm going to do is, I'm not going to -- I think

5    that the Probation's recommendation is a little more than is

6    necessary because I think it undercounts some of Mr. Letizia's

7    good deeds, so it's the judgment of the Court that Mr. Letizia

8    be sentenced in connection with Count One to a sentence of 60

9    months.  In connection with Counts Two and Three, it's going to

10   be 12 months, but those are to run concurrent with the sentence

11   that's imposed in connection with Count One.  Supervised release

12   is 3 years.  I'm not going to impose a fine because whatever

13   financial resources Mr. Letizia has should go towards the

14   forfeiture, which is -- and the restitution.  The forfeiture is

15   $46,200,000.

16           The restitution, I gather there's an order that's been

17   submitted, right, Mr. McMahon?

18           MR. McMAHON:  Yes, there is.

19           THE COURT:  And you've showed this to Counsel?

20           MR. McMAHON:  I believe so.

21           MR. HAFETZ:  Yes, your Honor.

22           THE COURT:  Okay.  All right.  And so the restitution

23   is in the amount of $1,440,238.

24           Is that correct, Mr. McMahon?

25           MR. McMAHON:  Let me double-check.

1              THE COURT:  That's what your order says, so...

2              MR. McMAHON:  If the order says it, then that's what

3    -- yes.

4              THE COURT:  All right.  And then the special

5    assessment is, as it must be, $150.  It's $100 for Count One and

6    $25 each for Counts Two and Three.

7              In terms of the conditions of supervised release, Mr.

8    Letizia is not to commit another federal, state, or local crime.

9    He's not to unlawfully possess a controlled substance.  I'm

10   going to suspend the drug testing condition because the Court

11   finds that Mr. Letizia is a very a low risk of any future

12   substance abuse, but he is to cooperate in the collection of DNA

13   as directed by the probation officer.

14             The standard conditions of supervised release 1 to 12

15   are imposed.  Those will be explained later.

16             The added conditions, Mr. Letizia is to provide the

17   probation officer with access to any requested financial

18   information.  He's also not to incur any new credit charges or

19   open additional lines of credit without the approval of the

20   Probation Office unless he's in compliance with the installment

21   payment schedule, which I'll get to in a minute.

22             Mr. Letizia is to report to the nearest probation

23   office within 72 hours of release from custody.  He can be

24   supervised by the district of his residence.

25             In terms of the restitution, while Mr. Letizia is

1  serving his term of imprisonment, he's to remit restitution in

2  conjunction with the Inmate Financial Responsibility Program,

3  but in any event, not less than $25 per quarter.  Through the

4  program, his deposits are to be reviewed for a six-month period

5  and the amounts are subtracted for commissary and other

6  expenses, and the remaining balance is used to determine

7  payments towards the financial sanctions, which includes the

8  restitution.  Mr. Letizia is to notify the U.S. Attorney's

9  Office for this District within 30 days of any change in his

10 mailing or residential address that occurs while the restitution

11 remains unpaid.

12         And then restitution is joint and several with...I'll

13 just say the individuals listed in paragraph 1-A1 through 4 of

14 the restitution order, and I'll adopt the payment instructions

15 that are also listed in paragraph 3.  And then, also, the

16 payments are to be made consistent with schedule A of the order,

17 which will accompany the judgment in this case.

18         Are there any open counts, Mr. McMahon?

19         MR. McMAHON:  Yes, there's an indictment and a

20 superseding indictment, and I would move to dismiss both.

21         THE COURT:  All right, that's granted.

22         Mr. Letizia, to the extent you haven't waived it, you

23 have a right to appeal this sentence.  You have to file a notice

24 of appeal within 14 days of when the judgment's entered.

25         In terms of a surrender date, Mr. Hafetz, what's your

1   proposal?

2          MR. HAFETZ:  Your Honor, we would ask for 90 days for

3   Mr. Letizia and the various things that he needs to get

4   organized, including some health issues that he has to deal

5   with.

6          THE COURT:  That seems reasonable.

7          Mr. McMahon, do you have a problem with that?

8          MR. McMAHON:  I don't object.

9          THE COURT:  Okay.

10         MR. HAFETZ:  But we would ask if the Court would

11  recommend to the Bureau of Prisons that Mr. Letizia's

12  incarceration time be served at the Montgomery Federal

13  Correctional Institute at Montgomery Maxwell Air Base in

14  Montgomery, Alabama.

15         THE COURT:  All right, I'll make that recommendation,

16  and we'll say that he is to surrender to the facility that the

17  Bureau of Prisons designates by August 18 of this year, by noon

18  on August 18.

19         Mr. Letizia, I say this to you not because I'm not

20  concerned you won't do it, but I'm duty bound to let you know

21  that it's a crime to fail to report to the institution as

22  directed to do so.

23         All right, Mr. Hafetz, anything else?

24         MR. HAFETZ:  No, your Honor.

25         THE COURT:  Mr. McMahon, anything else?

1             MR. McMAHON:  No, your Honor, thank you.

2             THE COURT:  Then we are adjourned.

3             Certified to be a true and accurate transcript.

4

5    _____

6             TABITHA DENTE, SR. COURT REPORTER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25